UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
ORANNA BUMGARNER FELTER,         )
et al.,                         )
                                )
        Plaintiffs,             )
                                )
        v.                      )        Civil Action No. 02-2156 (RWR)
                                )
KEN SALAZAR, et al.,            )
                                )
        Defendants.             )
_____)

<u>MEMORANDUM OPINION</u>

        Asserting that they are "mixed-blood" members of the Ute
Band of Indians, the plaintiffs filed this action in 2002 against
the Secretary[1] of the Department of the Interior ("DOI"), the
Assistant Secretary for Indian Affairs of the DOI, the United
States of America, and two employees of the Bureau of Indian
Affairs for injuries suffered as a result of the defendants'
alleged wrongful termination under the Ute Partition and
Termination Act ("UPA"), 25 U.S.C. §§ 677 et seq., of plaintiffs'
status as federally recognized Indians.  Defendants move to
dismiss plaintiffs' claims for lack of subject matter
jurisdiction and for failure to state a claim upon which relief
can be granted, arguing that the Department of the Interior and
Related Agencies Appropriations Act, 2004, Pub. L. No. 108-108,

_____
        [1] Ken Salazar is substituted for Gale Norton under Fed. R.
Civ. P. 25(d).

- 2 -

117 Stat. 1241 (2003) ("P.L. 108-108"), did not revive plaintiffs' claims for which the limitations period had expired, and that prior judgments preclude the plaintiffs' claim for an accounting.  Although P.L. 108-108 does apply retroactively to claims of trust mismanagement in litigation pending at the time of its enactment, the plaintiffs are collaterally estopped from arguing that they are entitled to an accounting due to the defendants' mismanagement of trust assets because prior litigation to which the plaintiffs are bound resolved that the UPA terminated the government's trust obligations.  Thus, the defendants' motion to dismiss will be granted.

BACKGROUND

The background of this case is fully discussed in Felter v. Norton, 412 F. Supp. 2d 118 (D.D.C. 2006) and Felter v. Kempthorne, 473 F.3d 1255, 1257-59 (D.C. Cir. 2007).  Briefly, the plaintiffs allege that their federal status as recognized Ute Indians was unlawfully terminated by the UPA.  In 1954, the Ute Tribe's General Council voted to categorize members of the tribe as either "full-bloods" or "mixed-bloods" and to separate the assets of the two groups.  In response to the vote, Congress passed the UPA, under which full-bloods were defined as Ute members whose ancestry was at least one-half Ute Indian and over one-half Indian.  25 U.S.C. § 677a(b).  Mixed-bloods were defined as Ute members who did not have sufficient Ute or Indian ancestry

- 3 -

to qualify as full-bloods.  25 U.S.C. § 677a(c).  The UPA formally distributed the reservation's assets between the mixed-bloods and the full-bloods, terminated the mixed-bloods' rights to a $32,000,000 Indian Claims Commission ("ICC") judgment because the mixed-bloods were no longer considered members of the Ute Tribe after the UPA, and terminated the mixed-bloods' status as federally recognized Indians.  As required by the UPA, the Secretary of the Interior then published in the Federal Register the list of the 490 mixed-bloods, 21 Fed. Reg. 2208-04, and the corresponding federal policy of terminating supervision over the affairs of the mixed-bloods and their status as federally recognized Indians, effective as of August 27, 1961.  26 Fed. Reg. 8042-03.

Plaintiffs' complaint seeks a judgment declaring that the 1961 list of the 490 mixed-bloods unlawfully terminated their status as recognized Ute Indians and is void; restoring their rights retroactively to their reservation assets wrongfully distributed under the UPA; restoring to their status as Uinta Indians the Uinta who were minors in 1961 and not listed among the 490; awarding the 490 damages for their loss of status as Indians under the UPA, for breach of trust and for the violation of the due process clause of the Fifth Amendment; and ordering an accounting of the $32,000,000 ICC judgment allocated to the Colorado bands of Ute Indians.  (Am. Compl. 61-64.)  Earlier, the

- 4 -

defendants' motion to dismiss all claims was granted because the plaintiffs did not allege any acts that the defendants committed within the six-year statute of limitations period under 28 U.S.C. § 2401(a), and failed to justify the application of any exception to allow them to file this action outside the limitations period. Felter, 412 F. Supp. 2d at 125-27.

On appeal, the plaintiffs raised a new issue, arguing that P.L. 108-108 "preserve[d] [their] claims." Felter, 473 F.3d at 1260. The D.C. Circuit agreed that the plaintiffs' claims had accrued in the 1950s and 1960s, that there were no continuous violations that made the complaint timely filed, and that equitable tolling of the statute of limitations did not apply. However, the court remanded the case "to determine whether [P.L.] 108-108 applies to any of Felter's claims." Id. at 1259-61.

On remand, the defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1) and (6), arguing that P.L. 108-108 does not apply to Count 8,[2] a claim for an accounting, because the plaintiffs' expired claim was not revived. (Defs.' Mem. of P. & A. in Supp. of Defs.' Renewed Mot. to Dis. ("Defs.' Renewed Mem.") at 5, 8, 10.) The defendants also argue that even if P.L. 108-108 revived the plaintiffs'

_____

[2] The defendants move to dismiss all of the plaintiffs' claims, not just Count 8. However, the plaintiffs' opposition did not address the defendants' motion to dismiss as to Counts 1 through 7. Therefore, the defendants' motion is deemed conceded as to Counts 1 through 7. See Peter B. v. CIA, 620 F. Supp. 2d 58, 70 (D.D.C. 2009).

claim, it would still be barred by collateral estoppel because
Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128
(1972), resolved that the UPA terminated the Secretary of the
Interior's responsibility over divisible tribal assets, including
the mixed-blood's share of the ICC judgment.  (Defs.' Renewed
Mem. at 12 n.8; Defs.' Mem. of P. & A. in Supp. of Defs.' Mot. to
Dis. at 14.)  The plaintiffs oppose the defendants' renewed
motion to dismiss, arguing that P.L. 108-108 revives their
accounting claim and that they are not collaterally estopped from
bringing the claim.  (Pls.' Opp'n to Defs.' Renewed Mot. to Dis.
at 20; Pls.' Suppl. Mem. in Opp'n to Defs.' Mot. to Dis. at 9-
15.)

## DISCUSSION

Whether the statute of limitations expired for the
plaintiffs' claim for an accounting should be analyzed under Rule
12(b)(6) for failure to state a claim.  See Felter, 412 F. Supp.
2d at 124.  The affirmative defense of collateral estoppel may
also be raised in a Rule 12(b)(6) motion to dismiss when "the
defense can either be established from the face of the complaint,
matters fairly incorporated within it, and matters susceptible to
judicial notice."  Mitchell v. United States, Civ. Action No. 05-
916 (RWR), 2007 WL 148781, at *2 n.2 (D.D.C. Jan. 16, 2007).  "A
Rule 12(b)(6) motion tests the legal sufficiency of a
complaint. . . ."  Browning v. Clinton, 292 F.3d 235, 242 (D.C.
Cir. 2002).  In a motion to dismiss for failure to state a claim

- 6 -

under Rule 12(b)(6), the complaint must be construed in the light most favorable to the plaintiff and "the court must assume the truth of all well-pleaded allegations." <u>Warren v. District of Columbia</u>, 353 F.3d 36, 39 (D.C. Cir. 2004).

I.    REVIVAL OF CLAIM UNDER P.L. 108-108

Congress included in P.L. 108-108 a provision which stated that

> notwithstanding any other provision of law, the statute
> of limitations shall not commence to run on any claim,
> including any claim in litigation pending on the date
> of the enactment of this Act, concerning losses to or
> mismanagement of trust funds, until the affected tribe
> or individual Indian has been furnished with an
> accounting of such funds from which the beneficiary can
> determine whether there has been a loss.

Pub. L. No. 108-108, 117 Stat. 1241, 1263.  Passed in 2003 while this litigation was pending, this trust fund provision serves to stop the statute of limitations period from beginning to run on claims involving losses or mismanagement of Indian trust funds until an accounting has been provided.  The defendants argue, however, that this provision in P.L. 108-108 does not apply retroactively to revive a claim for which the statute of limitations has already expired.

To determine whether a statute applies retroactively, a court "first look[s] for an express command regarding the temporal reach of the statute, . . . or, in the absence of language as helpful as that, determine[s] whether a comparably firm conclusion can be reached upon the basis of the normal rules

of [statutory] construction." <u>Lytes v. D.C. Water & Sewer Auth.</u>, 572 F.3d 936, 939 (D.C. Cir. 2009) (internal quotation marks and citations omitted); <u>see also</u> <u>Fernandez-Vargas v. Gonzales</u>, 548 U.S. 30, 37 (2006)); <u>Martin v. Hadix</u>, 527 U.S. 343, 354 (1999) (stating that a court looks for an unambiguous directive that the statute should be applied retroactively). "[C]ases where [the Supreme] Court has found truly 'retroactive' [applicability] adequately authorized by statute have involved statutory language that was so clear that it could sustain only one interpretation.'" <u>INS v. St. Cyr</u>, 533 U.S. 289, 316-17 (2001) (quoting <u>Lindh v. Murphy</u>, 521 U.S. 320, 328 n.4 (1997)). Next, if the statute contains no such express command and a firm conclusion cannot be otherwise reached, the court must determine "whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." <u>Republic of Austria v. Altmann</u>, 541 U.S. 677, 694 (2004) (quoting <u>Landgraf v. USI Film Prods.</u>, 511 U.S. 244, 280 (1994)). Finally, if the statute has a retroactive effect, a court then looks to whether the general "presumption against retroactive legislation [that] is deeply rooted in our jurisprudence," <u>id.</u> at 265, is overcome because "Congress has clearly manifested its intent to the contrary." <u>Hughes Aircraft Co. v. U.S. ex rel. Schumer</u>, 520 U.S. 939, 946 (1997). "The 'principle that the legal effect of

- 8 -

conduct should ordinarily be assessed under the law that existed
when the conduct took place has timeless and universal appeal.'"
Id. at 946 (quoting Landgraf, 511 U.S. at 265).  "'Requiring
clear intent assures that Congress itself has affirmatively
considered the potential unfairness of retroactive application
and determined that it is an acceptable price to pay for the
countervailing benefits.'"  AT&T Corp. v. Hulteen, 129 S. Ct.
1962, 1971 (2009) (quoting Landgraf, 511 U.S. at 272-73).
Legislative history can be considered when assessing Congress'
intention regarding retroactivity.  Lytes, 572 F.3d at 939-40
("If applying the statute would have such a disfavored effect,
then we do not apply it absent clear evidence in the legislative
history that the Congress intended retroactive application.").

      The defendants argue that Congress did not prescribe that
the trust fund provision apply retroactively to revive a time-
barred claim, relying on Cobell v. Babbitt, 30 F. Supp. 2d 24
(D.D.C. 1998).  Cobell interpreted an earlier version of the
Indian trust fund provision which did not contain the language
"including any claim in litigation pending on the date of the
enactment of this Act."[3]  Cobell determined that the phrase

_____

      [3] The provision at issue in Cobell stated "'[t]hat
notwithstanding any other provision of law, the statute of
limitations shall not commence to run on any claim concerning
losses to or mismanagement of trust funds, until the affected
tribe or individual Indian has been furnished with the accounting
of such funds[.]'"  30 F. Supp. 2d at 43 (quoting Department of
the Interior and Related Agencies Appropriation Act, 1991, Pub.
L. No. 101-512, 104 Stat. 1915).

- 9 -

"shall not commence to run" prevented the statute of limitations clock from commencing, but concluded that that version of the Indian trust fund provision "was [never] intended to do more than its name suggests.  In other words, the provision only tolls a clock that has not commenced running.  It cannot revive claims for which the clock stopped running long ago."  Cobell, 30 F. Supp. 2d at 44 (considering both the clear language of the earlier provision and its legislative history).

In response, the plaintiffs rely on Shoshone Indian Tribe of the Wind River Reservation v. United States, 364 F.3d 1339 (Fed. Cir. 2004), which interpreted Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, 117 Stat. 11.  That law and its predecessor considered by the Court of Federal Claims[4] were enacted while the Shoshone litigation was pending, and each contained a provision identical to the one at issue in this case. The Federal Circuit read that provision as preventing the limitations clock for any cause of action for trust fund losses or mismanagement from starting until an accounting takes place. Shoshone, 364 F.3d at 1347 (concluding that the statute "unambiguously delays the commencement of the limitations period until an accounting has been completed that reveals whether a loss has been suffered").  While Shoshone did not specifically

---

[4] Pub. L. No. 106-291, 114 Stat. 922, 939 (2000).  See Shoshone Indian Tribe of the Wind River Reservation, Wyoming v. United States, 51 Fed. Cl. 60, 63 (2001).

discuss revival of an expired claim, or the effect of the phrase
"including any claim in litigation pending on the date of the
enactment of this Act," <u>Shoshone</u> found that the trust fund
provision clearly permitted plaintiffs suing in 1979 to assert
claims of mismanagement occurring as far back as 1946 despite the
expiration of the limitations period existing in 1946.  <u>See</u>
<u>Simmons v. United States</u>, 71 Fed. Cl. 188, 193 (Fed. Cl. 2006)
(citing <u>Shoshone</u> to conclude that P.L. 108-108 "displaces
Section 2501 [a statute of limitations] and can resurrect
otherwise barred claims" (internal quotation marks omitted)).
Other courts have also adopted <u>Shoshone</u>'s interpretation that
such a trust fund provision delays the start of the limitations
clock.  <u>Otoe-Missouria Tribe of Oklahoma v. Kempthorne</u>, Civil
Action No. 06-1436, 2008 WL 5205191 (W.D. Okla. Dec. 10, 2008),
interpreted a trust fund provision identical to P.L. 108-108 to
"clearly express[] an intent to suspend all statutes of
limitations until an accounting has been provided."  <u>Id.</u> at *5
(stating without discussing the phrase "including any claim in
litigation pending on the date of the enactment of this Act" that
even if there was an ambiguity in reading the statute, the
ambiguity should be resolved in favor of the Native Americans and
application of any limitations period should be deferred until an
accounting is completed); <u>see also</u> <u>Tonkawa Tribe of Indians of</u>
<u>Okla. v. Kempthorne</u>, Civil Action No. 06-1435, 2009 WL 742896, at
*4 (W.D. Okla. Mar. 17, 2009) (relying on <u>Otoe-Missouria Tribe of</u>

- 11 -

Okla.'s interpretation of P.L. 109-54 to conclude that the plaintiff's claims are not time-barred until an accounting has been furnished).

A statute can contain an express command regarding its temporal scope even if does not contain the word "retroactive." Language in a provision stating that it "'shall apply to all proceedings pending on or commenced after the date of enactment . . . unambiguously addresses the temporal reach of the statute.'"  Martin, 527 U.S. at 354 (quoting Landgraf, 511 U.S. at 280); see also Sandhvani v. Chertoff, 460 F. Supp. 2d 114, 121 (D.D.C. 2006) (noting that the amendment was retroactive where Congress stated that the change was "effective immediately and applicable to cases in which the final administrative order of removal . . . was issued before, on, or after" the date that the . . . [original] Act was enacted" (internal quotation marks omitted)).  Courts have also found the statutory language that "[n]otwithstanding any other provision of law (including any effective date), the term applies regardless of whether the conviction was entered before, on, or after September 30, 1996" to apply retroactively to change the definition of an aggravated felony under the Immigration and Nationality Act, regardless of the conviction date.  Martinez v. INS, 523 F.3d 365, 370 (2d Cir. 2008); United States v. Kwan, 407 F.3d 1005, 1009 (9th Cir. 2005).

- 12 -

P.L. 108-108 uses comparable language addressing its temporal scope, at least with respect to the claim at issue in this case, which was pending at the time Congress enacted the provision.  The phrase "notwithstanding any other provision of law" operates "to supersede all other laws[, and] '[a] clearer statement is difficult to imagine.'"  Liberty Mar. Corp. v. U.S., 928 F.2d 413, 416 (D.C. Cir. 1991) (quoting Crowley Carribean Transp., Inc. v. United States, 865 F.2d 1281, 1283 (D.C. Cir. 1989)) (second alteration in original).  The "notwithstanding" language suggests that the trust fund provision was intended to supercede any contradictory statutory provisions, including 28 U.S.C. § 2401(a), which states that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a).  Taken with the "notwithstanding" language, P.L. 108-108's phrase "shall not commence to run" can be read to supercede § 2401(a)'s time bar, thus not triggering the limitations clock for a cause of action for trust fund losses or mismanagement "until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss."  Pub. L. No. 108-108, 117 Stat. 1241, 1263.

Of great importance here is that P.L. 108-108 applies "to any claim in litigation pending on the date of the enactment of this Act."  Plaintiffs filed their claim in 2002.  When Congress

- 13 -

enacted P.L. 108-108 in 2003, the plaintiffs' claim was pending
in litigation.  Therefore, the statute of limitations "shall not
commence to run" on the claim until the plaintiffs have been
furnished with an accounting.  Even though the language does not
contain an explicit directive to revive stale claims, it is
identical to the language that the Supreme Court hypothesized
would indicate an express command for retroactive application in
Martin and Landsgraf.  Whether the statutory language applies to
stale claims for which no suit was pending when P.L. 108-108 was
enacted is an issue that need not be reached here, but Congress
has left no ambiguity that the provision applies retroactively
with respect to claims pending in litigation when P.L. 108-108
was enacted.  See United States v. Zacks, 375 U.S. 59, 65-67
(1963) (holding that Congress retroactively reopens claims
otherwise barred by the statute of limitations when it creates a
"grace period" during which the claims can be brought).

Even assuming that no firm conclusion of retroactivity could
be drawn in construing the language in P.L. 108-108, applying
this provision as plaintiffs suggest would have retroactive
effect, and Congress has manifested its intent to overcome the
presumption against retroactive legislation.  The plaintiffs base
their claim on the termination of trust status and resulting
asset distribution that took place in the 1950s and 1960s.  "Any
such claim accrued in 1961 when Interior repudiated its trust
relationship with Felter and the other 'mixed-blood' Utes. . . ."

- 14 -

Felter, 473 F.3d at 1259.  Adopting the plaintiffs'
interpretation of the provision would revive these claims, which
the six-year limitations period in § 2401(a) barred in 1967.  See
Hughes Aircraft Co., 520 U.S. at 950 (1997) (describing a cause
of action as "moribund" after "the pre-existing period of
limitations has expired").  The statute would have a retroactive
effect under the plaintiffs' interpretation because the
defendants, whose duty, if any, to provide plaintiffs with an
accounting ended in 1967, would once again owe the plaintiffs
this same duty.  See Altmann, 541 U.S. at 694.

     Legislative history reveals that Congress intended this
retroactive effect.  While P.L. 108-108 was passed in 2003, the
original version of this Indian trust fund provision was passed
in 1990.  Cobell, 30 F. Supp. 2d at 43 n.20.  The legislative
history of the original 1990 trust fund provision reflected an
intent to

> extend the statute of limitations with relation to
> Indian trust fund management.  Since the audit and
> [reconciliation] of such funds, as directed by the
> Committee, will require at least 5 years to complete,
> it is possible that the statute of limitations for any
> significant discrepancies uncovered during this process
> may have expired by the time such audits are completed.
> Therefore, the Committee has agreed to provide this
> extension in order to protect the rights of the tribes
> and individuals involved should such protection prove
> necessary.

S. Rep. No. 101-534 (1990).  Congress' apparent concern at this
time was for claims accruing because of discrepancies uncovered
during the audit and reconciliation process.  Later, in the 1993

- 15 -

version, Congress amended this provision to add "any claim in litigation pending on the date of this Act[,]" which "clarif[ied] that cases in litigation are included under the language."  H.R. Rep. No. 103-158 (1993); see also Cobell, 30 F. Supp. 2d at 44 n.23 (citing Department of the Interior and Related Agencies Appropriations Act, Pub. L. No. 103-138, 107 Stat. 1379, 1391 (1993)).  The extension of the limitations period in 1993 would "protect the rights of tribes and individuals[,]" and clarified that "cases in litigation are included under the language."  H.R. Rep. No. 103-158.  The 1993 version of the trust fund provision has been included in subsequent appropriations acts, Cobell, 30 F. Supp. 2d at 43 n.20., including the Omnibus Appropriations Act, 2009, P.L. 11-8, 2009 HR 1105.  This legislative history reaffirms the conclusion reached from a plain reading of P.L. 108-108 -- it revives claims that were stale at the time of the previous provision's passage but were "in litigation pending" when Congress passed it in 2003.

II.  COLLATERAL ESTOPPEL

    The defendants argue that even if P.L. 108-108 revives the plaintiffs' claim for an accounting, the claim is barred by collateral etoppel.  (Defs.' Renewed Mem. at 12 n.8; Defs.' Suppl. Mem. in Supp. of Defs.' Renewed Mot. to Dis. at 6-12.) Judgments have preclusive effects, foreclosing relitigation of claims and issues that parties have already had a full and fair opportunity to litigate.  Taylor v. Sturgell, 128 S. Ct. 2161,

- 16 -

2171 (2008).  It has been "long recognized that '[p]ublic policy
dictates that there be an end of litigation; that those who have
contested an issue shall be bound by the result of the contest;
and that matters once tried shall be considered forever settled
as between parties.'"  Federated Dep't Stores, Inc. v. Moitie,
452 U.S. 394, 401 (1981) (alteration in original) (quoting
Baldwin v. Traveling Men's Ass'n, 283 U.S. 522, 525 (1931)).

Congress may waive the preclusive effect of a "prior
judgment entered in the Government's favor on a claim against the
United States."  United States v. Sioux Nation, 448 U.S. 371, 397
(1980).  In Sioux Nation, the Supreme Court rejected a separation
of powers challenge to the constitutionality of a statutory
provision that required the Court of Claims to rehear a claim it
previously had rejected.  Id. at 391.  The provision stated that
"[n]otwithstanding any other provision of law, . . . the Court of
Claims shall review [the claim] on the merits, without regard to
the defense of res judicata or collateral estoppel[.]"  92 Stat.
153.  The Court held that the provision did not raise separation
of powers concerns as it did not reduce the Court of Claims'
earlier judgment to an advisory opinion, and it did not prescribe
a rule for decision for the Court of Claims that would have
undermined its adjudicatory function.  Sioux Nation 448 U.S. at
391, 406 (citing Hayburn's Case, 2 U.S. 408 (1792), and United
States v. Klein, 80 U.S. 128 (1871)).  However, given the
separation of powers concerns inherent in Congress ordering

- 17 -

federal courts to revisit judgments previously thought final, the Supreme Court has since suggested that parties' ability to waive the preclusive effect of prior judgments is limited.  See <u>Plaut v. Spendthrift Farm, Inc.</u>, 514 U.S. 211, 231 (1995) (noting that while "waivers of res judicata [by litigants] are [not] always impermissible, . . . waivers of res judicata need not always be accepted"); <u>see also</u> <u>Commodity Futures Trading Comm'n v. Schor</u>, 478 U.S. 833, 851 (1986) (stating that when "Article III limitations are at issue, notions of consent and waiver [by parties] cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect").

Because the prospect of waiving the preclusive effects of a prior judgment raises serious constitutional questions with respect to a court's Article III powers, statutes should be construed, if possible, not to have this effect.  See <u>Machinists v. Street</u>, 367 U.S. 740, 749-50 (1961) (noting that "if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided") (internal quotation marks omitted).  Unlike the statute at issue in <u>Sioux Nation</u>, which referred specifically to the defenses of res judicata and collateral estoppel, P.L. 108-108 is capable of a construction that does not have the potential effect of reducing an Article III court's decision to an advisory

- 18 -

opinion or undermining a court's adjudicative function.  Even
though it applies "notwithstanding any other provision of law,"
P.L. 108-108 does not specifically or unequivocally waive the
preclusive effect of prior judgments.  Accordingly,
"notwithstanding any other provision of law" should not be
construed to allow plaintiffs to bring their claim for an
accounting if a prior decision forecloses that possibility.  See
NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 500 (1979)
(noting that when a particular interpretation of a statute would
raise separation of powers questions, "there must be present the
affirmative intention clearly expressed" to adopt that
interpretation).

Collateral estoppel "forecloses 'successive litigation of an
issue of fact or law actually litigated and resolved in a valid
court determination essential to the prior judgment,' even if the
issue recurs in the context of a different claim."  Taylor, 128
S. Ct. at 2171 (quoting New Hampshire v. Maine, 532 U.S. 742, 748
(2001)).  "'When an issue of fact or law is actually litigated
and determined by a valid and final judgment, and the
determination is essential to the judgment, the determination is
conclusive in a subsequent action between the parties, whether on
the same or a different claim.'"  Consolidated Edison Co. of N.Y.
v. Bodman, 449 F.3d 1254, 1258 (D.C. Cir. 2006) (quoting Fogg v.
Ashcroft, 254 F.3d 103, 111 (D.C. Cir. 2001)).  The party against
whom issue preclusion is invoked must have had an incentive to

- 19 -

fully litigate the issue in the first proceeding, so that
preclusion does not "work a basic unfairness to the party bound
by the first determination". Yamaha Corp. of America v. United
States, 961 F.2d 245, 254 (D.C. Cir. 1992). Although collateral
estoppel typically operates to bind the parties to the previous
suit only, it may also bind a nonparty if the issue was decided
in a suit brought by a party acting as "a fiduciary
representative for the beneficial interest of the nonpart[y]."
Sea-Land Servs. v. Gaudet, 414 U.S. 573, 593 (1974).

The plaintiffs claim that they are entitled to an accounting
because the defendants mismanaged trust funds to which the
plaintiffs assert they are entitled. (Am. Compl. ¶¶ 106-12.)
This claim rests on the premise that the defendants are "charged
with carrying out the trust obligations of the United States"
(id. ¶ 109), as the defendants could not have mismanaged assets
for which they were not responsible. Although the Secretary of
the Interior's proclamation, published in the Federal Register in
1961 as provided for in the UPA, purported to terminate the
federal trust relationship to mixed-blood property, 26 Fed. Reg.
8042-03, the plaintiffs assert that the termination was
ineffective because the UPA was never implemented as intended by
Congress. (Id.)

However, in Affiliated Ute Citizens, the Supreme Court
recognized that the UPA had been implemented as intended by
Congress. The UPA authorized the mixed-bloods to organize and

adopt a constitution.  25 U.S.C. § 677e.  Under this provision,
the mixed-bloods organized an unincorporated association, the
Affiliated Ute Citizens of the State of Utah ("AUC").  Affiliated
Ute Citizens, 406 U.S. at 135-36.  The UPA also authorized the
mixed-bloods to select "authorized representatives with power 'to
take any action that is required by [the UPA] to be taken by the
mixed-blood members as a group[.]'"  Id. at 135 (quoting 25
U.S.C. § 677e).  Under this provision, the mixed-bloods
incorporated the Ute Distribution Corporation ("UDC") to manage
the indivisible assets of the mixed-bloods, and the UDC issued
shares of stock.  Id. at 136.  Eighty-five mixed-bloods sold
their shares and then sued various defendants involved in the
transaction, including the United States, claiming that the sale
violated the Securities and Exchange Act of 1934.  Id. at 144-45.
The Supreme Court granted certiorari in the securities case,
Reyos v. United States, 431 F.2d 1337 (10th Cir. 1970), and
consolidated it with a related case in which the Court had also
granted certiorari, Affiliated Ute Citizens v. United States, 431
F.2d 13490 (10th Cir. 1970), which raised the issue of whether
the UDC or the AUC was the authorized representative of the
mixed-bloods for the purpose of distributing pro-rata shares of a
mixed-blood mineral interest.  Affiliated Ute Citizens, 406 U.S.
at 141.  The Court held that the 1961 proclamation by the
Secretary had terminated federal control over the divisible
mixed-blood assets, which included shares of the UDC stock, and

that the United States could not be held liable for failing to restrain the sale because "there was no remaining governmental authority over those shares."  Id. at 150.

This holding resolved the issue the plaintiffs are now attempting to litigate.  In the present case, the plaintiffs claim that the UPA did not terminate the government's trust obligations over the ICC judgment.  Affiliated Ute Citizens determined that the UPA did effectively terminate the federal trust status of the mixed-blood divisible assets, and this certainly includes their share of the ICC judgment -- an amount in dollars that the mixed-bloods could separate and distribute as they saw fit.  The parties actually litigated this issue in Affiliated Ute Citizens, and the Supreme Court actually decided it.  The determination was essential to the judgment, as there was no other basis upon which the court could have concluded that the United States was not liable for failing to restrain the sale, and this gave the plaintiffs an incentive to fully litigate the issue at the time.

"Generally speaking, one whose interests were adequately represented by another vested with the authority of representation is bound by [a previous] judgment, although not formally a party to the litigation."  Ellentuck v. Klein, 570 F.2d 414, 425-26 (2d Cir. 1978) (quoting Expert Elec., Inc. v. Levine, 554 F.2d 1227, 1233 (2d Cir. 1977).  AUC brought suit in Affiliated Ute Citizens "as representative of its 490 mixed-blood

- 22 -

members[.]"  406 U.S. at 139.  As mixed-bloods or descendants of
mixed bloods, the plaintiffs in this case are in privity with
AUC, as they had their interests adequately represented by AUC in
<u>Affiliated Ute Citizens</u>, since any judgment in AUC's favor would
have conferred a financial benefit on each of its members.[5]
Although AUC was not a named plaintiff in the companion <u>Reyos</u>
case, all the plaintiffs in that case were members of AUC, the
same lawyer represented the parties in both of the cases, and AUC
funded the <u>Reyos</u> suit.  <u>Murdock v. Ute Indian Tribe of Uintah and
Ouray Reservation</u>, 975 F.2d 683, 689 (10th Cir. 1992).  The Tenth
Circuit, in determining that <u>Affiliated Ute Citizens</u> collaterally
estopped mixed-blood plaintiffs from contesting that the UDC was
the authorized representative of the mixed-bloods for the purpose
of managing indivisible Ute assets, concluded from these
interconnections that the "AUC was in privity with the *Reyos*
plaintiffs."  <u>Id.</u>  The plaintiffs here, then, are bound by the

---

[5] There are certain individual plaintiffs named in the
complaint who were neither mixed-bloods nor descended from mixed-
bloods.  To the extent that these plaintiffs were not in privity
with the AUC, which only purported to represent the interests of
the 490 mixed-bloods in <u>Affiliated Ute Citizens</u>, such that these
plaintiffs are not bound by the court's determination that the
government's trust obligations over the ICC judgment had been
terminated, the complaint will be dismissed with respect to them
under Fed. R. Civ. P. 12(b)(1) for lack of subject matter
jurisdiction.  These plaintiffs lack standing because they are
not owed any part of the mixed-blood share of the ICC judgment
and cannot allege an injury-in-fact that would be redressed by an
accounting of the portion of the judgment owed to the mixed-
bloods.  <u>See</u> <u>Wright v. Foreign Serv. Grievance Bd.</u>, 503 F. Supp.
2d 163, 171 (D.D.C. 2007).

- 23 -

resolution of the trust issue even though they were not named

parties in the prior suit because the <u>Affiliated Ute Citizens</u>

plaintiffs were acting as their fiduciary representatives and for

their benefit.  Since the plaintiffs are precluded from arguing

that the federal government was responsible for holding the ICC

judgment in trust after the Secretary of the Interior's

proclamation terminated the trust relationship, there are no

assets for which the defendants are required to account, and the

plaintiffs cannot state a claim upon which relief can be granted.

<u>CONCLUSION</u>

Although P.L. 108-108 did revive at the time of its

enactment time-barred claims then pending in litigation, it did

not waive the preclusive effects of prior judgments, and the

plaintiffs are collaterally estopped from arguing that the

defendants had an obligation to supervise in trust the

plaintiffs' share of the ICC judgment.  The plaintiffs therefore

cannot demonstrate that they are entitled to an accounting, and

the defendants' motion to dismiss will be granted.  A final order

accompanies this Memorandum Opinion.

SIGNED this 15th day of January, 2010.

                                    _____/s/_____
                                    RICHARD W. ROBERTS
                                    United States District Judge